# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 11, 2006     Decided December 29, 2006

No. 05-5263

DERREK E. ARRINGTON
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01391)

*Richard H. Frankel*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs were *Steven H. Goldblatt*, Director, and *Ariana Torchin* and *Elizabeth Glasgow*, Student Counsel.

*Derrek E. Arrington*, *pro se*, filed a brief.

*Beverly M. Russell*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

*Stacy L. Anderson*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Robert J. Spagnoletti*, Attorney General, *Todd S. Kim*, Solicitor General, and *Edward E. Schwab*, Deputy Attorney General. *Mary L. Wilson*, Assistant Attorney General, entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring and dissenting opinion filed by *Circuit Judge* BROWN.

EDWARDS, *Senior Circuit Judge*: Derrek E. Arrington, appellant, filed a lawsuit in District Court seeking relief under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680 (2000), and 42 U.S.C. § 1983 (2000), for alleged police brutality. The District Court granted summary judgments in favor of appellees – the United States, on behalf of the United States Park Police ("USPP"), and Sergeant Rick Murray of the District of Columbia Metropolitan Police Department ("MPD") – and Arrington now appeals. Appellant also alleged common law tort violations against the District of Columbia. The District Court held that these claims against the District were barred by appellant's failure to file a timely D.C. CODE § 12-309 (2001) notice of intent to sue. Appellant does not challenge that judgment on appeal.

Appellant acknowledges that he inappropriately engaged police officers by fleeing from a lawful traffic stop. He claims, however, that after he was pursued by officers, and eventually captured, restrained, disarmed, and handcuffed, Murray and members of the USPP beat him severely for approximately ten minutes, in violation of District of Columbia law and his constitutional rights. Appellees do not dispute using exceptional

force against appellant, but justify their actions as necessary to disarm appellant, who they believed had just shot a USPP officer.

The District Court also granted summary judgment in favor of the United States, finding that "the undisputed material facts establish that the police officers' conduct was reasonable under the circumstances." *Arrington v. U.S. Park Police*, No. Civ. A. 01-1391, 2005 WL 1076186, at *1 (D.D.C. May 6, 2005). And, finally, the District Court granted summary judgment in favor of Sergeant Murray, holding that he was entitled to qualified immunity. *Arrington v. U.S. Park Police*, No. Civ. A. 01-1391 (D.D.C. May 26, 2005).

The principal question in this case is whether the officers who inflicted bodily harm on appellant employed more force than was reasonably necessary. We find that the evidence before the District Court, viewed in the light most favorable to appellant, creates a genuine issue of material fact as to whether appellant was severely beaten by the officers *after* he had been captured, restrained, disarmed, and handcuffed. Obviously, if appellant was completely detained and rendered helpless before being brutally beaten, then a reasonable jury could return a verdict for him. There is a genuine issue of material fact on this matter. And because the resolution of this issue involves credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, it is inappropriate for summary judgment. We therefore reverse and remand.

## I. BACKGROUND

In April 2000, a vehicle driven by appellant was stopped by USPP officers John Daniels and Martin Yates when they noticed that the car displayed no front license plate. After appellant was stopped, the officers saw a cellophane "ziplock" bag on the passenger side floorboard and thought that the bag might contain

narcotics. Yates asked the passenger in appellant's car to hand him the bag. After the passenger complied, Yates confirmed that the bag contained cocaine. Daniels then ordered appellant to exit the vehicle. Instead of following the officer's instruction, appellant drove the car away from the scene of the stop, dragging Daniels approximately 75 yards before the officer could free himself. Once Daniels was free, he joined Yates in their vehicle and pursued appellant. While driving at a high speed, appellant lost control of his vehicle and collided with a median. Appellant quickly abandoned the disabled vehicle and ran from the pursuing officers, armed with a .380 caliber firearm.

Sergeant Rick Murray, who was heading home in a marked MPD police car, saw appellant crash his vehicle and then run, followed by Daniels, also on foot. Murray stopped his vehicle and joined the pursuit. The chase ended when Daniels caught appellant trying to climb a fence into a residential backyard. At this point, the stories diverge.

Appellant claims that Daniels caught him and slammed him against the fence, causing appellant to drop his weapon to the ground. Then, according to appellant, the officers threw him face down on the ground, handcuffed him with his hands behind his back, and proceeded to beat him about the ribs, back, and head. Appellant says that he was absolutely helpless while being beaten by several officers. He also claims that the beating inflicted on him was so severe that it caused him to drift in and out of consciousness. He allegedly awoke to the pain of a dog biting his leg. By appellant's account, the officers beat him nonstop for approximately ten minutes. Appellant disclaims shooting his weapon at officer Daniels. Rather, he maintains that the gun he was carrying accidently discharged, resulting in the officer's gunshot wound.

Appellees offer a different account of the events at issue. According to appellees, Daniels pulled appellant off of the fence

and Murray punched appellant in the ribs two or three times in order to restrain and handcuff him. Before the officers could handcuff appellant, he allegedly raised his arm toward Daniels and fired his weapon, shooting Daniels in the face. Murray claims that he then tackled appellant to the ground and held him in a bear hug but could not dislodge the weapon. Yates arrived at the scene to find Daniels slumped against a fence and Murray struggling with appellant. Murray allegedly told Yates to shoot appellant, because appellant had a gun. Yates claims that instead of shooting appellant, he struck him on the head a number of times with his service weapon but still could not disarm him. USPP Officer Russell Kidd then arrived at the scene and allegedly saw appellant lying face down with both Murray and Yates on top of him. Yates claims that he told Kidd that appellant had a gun and Kidd, in yet another alleged attempt to disarm appellant, struck appellant on the head with a compressed telescopic baton. Appellees claim that, despite these continuous beatings, appellant still refused to surrender his weapon. Officer Michael Peer of the USPP Canine Unit joined the four officers already on the scene with a patrol dog. Peer allegedly instructed the dog to apply controlled bites to appellant's leg. Appellees say that it took almost ten minutes before Murray could disarm appellant.

"On May 10, 2000, Arrington was indicted on four counts of violating federal law. Count 1 charged him with using [his vehicle as] a dangerous weapon to forcibly assault, resist, oppose, impede, intimidate, or interfere with three federal officers engaged in the performance of their duties, in violation of 18 U.S.C. § 111(a) and (b). Count 2 charged him with attempting to murder a federal officer, in violation of 18 U.S.C. § 1114. Count 3 accused Arrington of discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). And Count 4 charged him with unlawfully possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2)." *United States v. Arrington*,

309 F.3d 40, 42 (D.C. Cir. 2002). "The jury convicted Arrington on Counts 1 and 4, but deadlocked on Counts 2 and 3 – the attempted murder and discharging-a-firearm counts. The latter two counts were retried twice (along with a new, additional count), each trial ending in deadlock. After the third trial, the government dismissed the outstanding counts." *Id.* at 43.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* a district court's decision to grant summary judgment. *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. And, with respect to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Although a jury might ultimately decide to credit the version of the events described by defendants over that offered by the plaintiff, "this is not a basis upon which a court may rest in granting a motion for summary judgment." *George*, 407 F.3d at 413. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. *Id.* at 255. And, in assessing a motion for summary judgment, a court must view all of the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Kaempe*, 367 F.3d at 965.

## B. *Threshold Issues Regarding Jurisdiction and the Scope of Review*

Before undertaking our review of appellant's challenge to the summary judgments in favor of appellees, we must first consider two threshold issues. First, the District of Columbia and Sergeant Murray argue that this court lacks jurisdiction to consider the District Court's May 26, 2005 judgment in their favor, because, in his notice of appeal, appellant challenged only the judgment in favor of the United States. Second, the United States argues that, because appellant never provided the District Court with a statement of genuine issues in support of his opposition to summary judgment as required by Local Civil Rule 7(h), the facts as presented by appellees stand uncontroverted. For the reasons noted below, we reject each of these claims in turn.

### 1. *This Court's Jurisdiction To Review the Judgment Rendered in Favor of Sergeant Murray*

Murray seeks dismissal of the appeal against him on jurisdictional grounds, claiming that appellant failed to file timely notice of appeal. *See* FED. R. APP. P. 3. In particular, he contends that appellant filed two notices of appeal, neither of which purported to appeal the District Court's May 26, 2005 grant of summary judgment in his favor. Therefore, according to Murray, this court lacks jurisdiction, because appellant failed to "designate the judgment, order, or part thereof being appealed." FED. R. APP. P. 3(c)(1)(B).

Appellant, acting *pro se*, filed two documents titled "Notice of Appeal," one apparently self-created and the other using a court template. Joint Appendix ("J.A.") 113-15. The second notice refers to the date of the order of summary judgment in favor of the United States, but by its language appeals from an order "in favor of [the] United States of America and the District of Columbia." J.A. 115. This was clearly adequate to satisfy the requirements of Federal Rule of Appellate Procedure 3.

In *Martinez v. Bureau of Prisons*, 444 F.3d 620 (D.C. Cir. 2006), we recognized jurisdiction where we could reasonably discern that a would-be appellant wished to appeal multiple orders although his notice of appeal referred only to a single order. The court, cognizant of the fact that "appellant was proceeding *pro se*," held that his "intention to appeal from both rulings of the district court [could] be fairly inferred from his notice of appeal and no appellee [was] prejudiced." *Id.* at 623. The same is true here. On appeal, Sergeant Murray is represented by the Attorney General for the District of Columbia, "who has presented [his] arguments and shown no evidence that [he] would be prejudiced if appellant's challenges to the [May 26, 2005] order were addressed by this court." *Id.*

On the record here, we can easily infer appellant's intent to appeal both orders of the District Court with respect to both current appellees, so Federal Rule of Appellate Procedure 3(c)(1)(B) does not bar his appeal. *See also* 16A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3949.4 (3d ed. 1999) ("Defects in the wording of the notice of appeal are generally overlooked if the true intentions of the appellant can fairly be ascertained, if the courts have not been misled, and if the other parties have suffered no prejudice.").

### 2. *The Applicability of Local Rule 7(h) in Defining the Scope of Review*

The United States argues that "Appellant neither provided a statement of genuine issues in support of his opposition to summary judgment as required by Local Civil Rule 7(h), nor urged a different standard. Accordingly, given Appellant's omission, the District Court was not presented with any factual issues properly in dispute. And, because Appellant failed to argue that a different standard should be applied, he waived this new argument on appeal." Br. for Appellee United States at 13 (internal citation omitted). This is a specious argument. The United States readily concedes that "the District Court did not treat Appellee United States' statement of material facts not in dispute as conceded, [but] instead, reviewed Appellant's claims on the merits in light of the evidence presented by the parties." *Id.* at 17. This concession says it all.

Rule 7(h) permits, but does not require, the District Court to "assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h). Appellant filed a memorandum in opposition to the motion for summary judgment, but the filing did not conform to the standards of the rule. The District Court, however, did not limit its consideration to, or treat as admitted, the facts contained in appellees' statement of material facts. In assessing appellees' motions for summary judgment, the District Court acted within its discretion in reviewing the entire record.

"This circuit has long upheld strict compliance with the district court's local rules on summary judgment when invoked by the district court." *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150-51 (D.C. Cir. 1996) (discussing Rule 7(h)'s predecessor rule). But when, as here,

the local rule "does not require the district court to enter judgment because of the nonmoving party's default in complying with the local rule," *Burke*, 286 F.3d at 518, "we review the grant of summary judgment in light of [the] requirements" of Federal Rule of Civil Procedure 56, *id.* at 519-20. We therefore reject the claim by the United States that the facts as presented by appellees stand uncontroverted.

**C.  *Because There Is a Genuine Dispute As to a Material Fact, Appellees Are Not Entitled to Summary Judgment***

We review *de novo* the District Court's grant of summary judgment to appellees, viewing all of the evidence in the light most favorable to appellant. To survive a motion for summary judgment, the party bearing the burden of proof at trial – in this case, appellant – must provide evidence showing that there is a triable issue as to an element essential to that party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The principal legal issue in this case is whether the officers who inflicted severe bodily harm on appellant violated his rights by using more force than was reasonably necessary. The question that we face is whether appellant has provided sufficient evidence to show that there is a genuine issue of material fact with respect to this legal claim.

The parties agree that appellant's FTCA assault and battery claim is governed by District of Columbia law. They also agree that the controlling legal standard governing a claim against police officers for assault and battery is set forth in *Etheredge v. District of Columbia*, 635 A.2d 908 (D.C. 1993):

> A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary. Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in

danger of bodily harm.  Use of "deadly force," however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm.[9]

> [9.] "Deadly force" is force which is likely to cause death or serious bodily harm.

635 A.2d at 916 & n.9 (internal citations and quotation marks omitted).  *Etheredge* also cites with approval the following passage from *Graham v. Connor*, 490 U.S. 386 (1989):

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal citations omitted).

With this legal standard in mind, we must consider whether the evidence before the District Court, viewed in the light most favorable to appellant, creates a genuine issue as to any material fact such that a reasonable jury could return a verdict for appellant.  We find that it does.

Appellees do not dispute that, in pursuing and subduing appellant, the officers struck him with their fists, a telescopic baton, and a pistol grip, and also ordered a trained police dog to bite appellant's leg.  The facts that the parties do dispute – and they are central – are whether, as appellees contend, force was used to subdue appellant while he was armed and before he was in handcuffs, or whether, as appellant contends, he was beaten by police officers after he was captured, restrained, disarmed, and handcuffed.  If appellant's hands were handcuffed behind

his back before the officers inflicted bodily harm on him, as appellant claims, it stands to reason that appellant was disarmed before he was beaten. Appellees do not suggest otherwise. And the materiality of this factual dispute is obvious.

If appellant's version of facts is accepted as true, there is little doubt that a jury could find that he satisfies the "excessive force" standard under *Etheredge*. In other words, if several police officers severely and continuously beat up an unarmed and virtually defenseless man for ten minutes, this would constitute unlawful "deadly force." *Etheredge*, 635 A.2d at 916 n.9. A severe beating for *ten minutes* is a long time. A single round of boxing, involving two equally unrestrained combatants, is only three minutes. A jury could certainly find that no "reasonable officer" would believe that the brutality here would be necessary under the circumstances alleged by appellant.

The depositions of the officers involved in appellant's arrest confirm the degree of force used. One officer admits repeatedly striking appellant on the head with a compressed telescopic baton "with as much force as [he] could muster," Kidd Dep. 21:15-22:11, Oct. 27, 2004, J.A. 227-28, and another describes striking appellant with the side of his handgun in a "violent" and "fast" manner, Yates Dep. 69:12-15, Nov. 10, 2004, J.A. 309. On the basis of these facts, a jury could reasonably find that the officers violated District of Columbia law by exercising more force than they reasonably believed necessary, *see Etheredge*, 635 A.2d at 916, and violated appellant's Fourth Amendment right against unreasonable seizure by using force not "objectively reasonable in light of the facts and circumstances confronting them," *Graham*, 490 U.S. at 397 (internal quotation marks omitted).

In its brief to this court, Appellee United States makes the implausible argument that, even if appellant was handcuffed, nothing in the record indicates that the officers had knowledge of that fact. Br. for Appellee United States at 18 n.20. At oral

argument, however, counsel for the United States readily agreed that at least one officer – the one who allegedly handcuffed appellant – would have known that appellant was handcuffed while beaten if in fact appellant's story is true. Tr. of Oral Argument at 16. Likewise, counsel for Murray conceded that "it's obvious that beating a handcuffed man presents a very, very difficult case for [Sergeant Murray]." *Id.* at 23. Indeed, counsel candidly acknowledged that Murray's case "rise[s] and fall[s] on the question of whether [appellant] was handcuffed." *Id.* We agree.

Whether other officers also knew that appellant was handcuffed is a matter to be determined by a finder of fact. In performing our review of the District Court's grant of summary judgment, we need only decide the materiality of the alleged fact that the officers handcuffed appellant before the administration of force. We find it unquestionably material.

Our inquiry does not end here, however. Having found a material disputed fact, we must nonetheless uphold the grants of summary judgments if there is no *genuine* dispute as to the material fact. On this point, appellees argue that "[c]onclusory, unsubstantiated statements of an opposing party which are unsupported by specific facts are insufficient to overcome a summary judgment motion," Br. for Appellee Murray at 21, citing *Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999). Interestingly, appellant also cites *Greene*, for the accepted proposition that a "non-moving party's affidavit [is] sufficient to defeat summary judgment in [the] face of contradicting testimony." Appellant's Reply Br. at 25.

Appellant has the better of this duel, because *Greene* clearly states that a plaintiff may defeat a summary judgment granted to a defendant if the parties' sworn statements are materially different. On this point, the court stated:

In granting summary judgment for the Navy on Greene's claim for sexual harassment, the district court quite clearly invaded the province of the jury. Greene submitted a sworn affidavit stating that Clause had harassed and raped her, and that the proffered diary suggesting otherwise was a forgery. If true, these allegations are indisputably sufficient to support a verdict against the Navy under Title VII. The allegations may, of course, be false. That is a question not for the court, however, but for the jury.

. . . .

As the party moving for summary judgment, the Navy bears the initial burden of identifying evidence that demonstrates the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On the record before us, however, we can determine neither the point at which Clause's harassment became severe or pervasive nor when a reasonable person would have reported his behavior. A jury may resolve both these issues in favor of the Navy, but without improperly resolving disputed issues of fact, we cannot.

*Greene*, 164 F.3d at 674, 675 (internal citation omitted). Later in the opinion, the *Greene* decision notes that "[a]lthough, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." *Id.* at 675. The court made this point in rejecting the plaintiff's challenge to the summary judgment granted in favor of the defendant on her claim of retaliation. The court found the retaliation claim "conclusory," because plaintiff offered nothing more than a "representation in her affidavit that she applied for summer jobs in 1996 and 1997 and was not hired although 'another student, who had less experience and education was hired back' in

1996." *Id.* The court's affirmance of the summary judgment on the retaliation claim is unsurprising, because, as the decision notes, "a jury would be in no position to assess [her] claim of [superior qualifications]." *Id.*

The evidence offered by appellant in this case is easily distinguishable from the conclusory representations offered by the plaintiff in *Greene* in support of her retaliation claim. Appellant's claim here that he was "thrown to the ground . . . , immediately dropped his gun," and "was then handcuffed and then beaten while face down," Plaintiff's Statement of Material Facts in Dispute at ¶ 1, J.A. 131, finds support in sworn deposition testimony filed in the District Court, Arrington Dep. 88:14-95:25, Nov. 16, 2004, J.A. 190-92. Thus, unlike the plaintiff's retaliation charge in *Greene*, appellant here provides direct testimonial evidence of the violations he now alleges. Possessed of this testimony, a jury can assess the validity of appellant's claims.

As the court noted in reversing the summary judgment for the defendant with respect to the sexual harassment charge in *Greene*, "[a] jury may resolve [the issue] in favor of the [defendant], but without improperly resolving disputed issues of fact, we cannot." *Greene*, 164 F.3d at 675. The same is true in this case. *See also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (holding that, "[w]here the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied."); *cf*. *Johnson v. Jones*, 515 U.S. 304, 307-08 (1995) (In rejecting an interlocutory appeal on police officers' claim of qualified immunity, the Court pointed to plaintiff's "deposition, in which he swore that officers (though he did not name them) had used excessive force when arresting him and, later, in the booking room at the station house.").

On the record at hand, neither the District Court nor this court can conclude that appellees' story is truthful and

appellant's story is a fabrication, at least not if all of the evidence is viewed in the light most favorable to appellant as required by Federal Rule of Civil Procedure 56(c). As noted above, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. There is a genuine issue of material fact in this case which makes it clear that appellees are not entitled to a judgment as a matter of law.

**D.** *Officer Murray's Claims of Qualified Immunity*

Appellee Murray seeks affirmance of the District Court's judgment in his favor on the grounds of qualified immunity. When applicable, "[q]ualified immunity under section 1983 shields a state or local official from personal liability." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 402 (D.C. Cir. 2006). However, qualified immunity does not shield government officials who "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court enunciated a two-step analysis for determining whether qualified immunity applies. First, the court must determine whether the complainant alleges violations of constitutional rights. *Id.* at 201. If constitutional violations are alleged, the court must next determine whether the right allegedly violated is clearly established. *Id.*

Qualified immunity cannot be granted on summary judgment, however, if there is a genuine issue as to a material issue of fact. This point is frequently made in cases in which defendants seek to file an interlocutory appeal challenging a district court's denial of their motions for summary judgment on grounds of qualified immunity. *See, e.g.*, *Elliott v. Thomas*, 937 F.2d 338, 342 (7th Cir. 1991) ("[T]he *reason* a court of appeals examines the facts is to determine whether it was 'clearly

established' at the time that [the defendants'] deeds were forbidden. It would extend [the qualified immunity doctrine] well beyond its rationale to accept an appeal containing nothing but a factual issue.") (internal citation omitted); *cf. Johnson*, 515 U.S. 304 (holding that pretrial "evidence insufficiency" claims made by public official defendants who assert qualified immunity defenses are not immediately appealable).

Murray testified that he held appellant down on the ground and ordered another officer to beat appellant and, at one point, to shoot appellant in the head. Murray Dep. 31:13-35:14, Nov. 4, 2004, J.A. 264-65. Murray also testified that he restrained appellant while another officer ordered his patrol dog to bite appellant's leg. *Id.* 35:18-36:9, J.A. 265. Murray made these statements in describing a struggle to disarm appellant. However, if we accept appellant's sworn testimony that he was handcuffed, and in reviewing a grant of summary judgment we must, *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005), we find that the actions taken by Murray could persuade a reasonable jury that Murray committed constitutional violations sufficiently significant to overcome the qualified immunity bar set forth in *Saucier v. Katz*. In sum, there is a genuine issue of material fact which makes it clear that Murray is not entitled to summary judgment on his claim of qualified immunity.

## III. CONCLUSION

Appellant makes the claim, supported by sworn testimony, that he was disarmed, thrown to the ground, handcuffed, and severely beaten by appellees for ten minutes. Appellees maintain, also by sworn testimony, that in order to disarm appellant, who they believed had just shot a USPP officer in the face, it was necessary to hold him down and beat him for ten minutes, using their fists, a telescopic baton, and the grip of a handgun, and then instruct a patrol dog to bite his leg. If all of the evidence is viewed in the light most favorable to appellant,

as required by Rule 56(c), appellees surely are not entitled to judgment as a matter of law. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Because we find a genuine dispute concerning a material fact, we hold that this case is unsuitable for disposition by grant of summary judgment.

Our dissenting colleague may or may not be right in her characterization of the facts. But fact finding is not the role of the appellate court. That the dissent strains mightily in this misplaced fact finding effort serves only to highlight the existence of a genuine issue of material fact. It is also noteworthy that three criminal juries have deadlocked on counts charging Arrington with attempting to murder a federal officer and discharging a firearm during a crime of violence. *See Arrington*, 309 F.3d at 42. Obviously, the testimony of the police officers is not as clear cut as the dissent would have it. In any event, the trier of fact in this civil case will have an opportunity to sort this out.

For the foregoing reasons, the grants of summary judgments in favor of the United States and Sergeant Murray are hereby reversed and remanded.

*So ordered.*

BROWN, *Circuit Judge, concurring and dissenting*: I agree with the majority that we should affirm the grant of summary judgment for the District of Columbia and that appellate jurisdiction is proper despite defects in the notice of appeal. However, I do not agree with the majority's view that Derrek Arrington's deposition testimony creates a genuine issue of material fact which precludes summary judgment. Maj. Op. 10-16. The majority acknowledges that Arrington's testimony lacks credibility but concludes it is for the jury to determine its truthfulness. I disagree. This is not testimony about which reasonable minds could differ; this is a confabulation Candide would find suspect.

I

In this case the facts are important; so are the laws of physics. Here both the facts and the physics support the district court's grant of summary judgment. Based on any remotely reasonable reading of the record, the following is what happened. Arrington was stopped by Park Police for failure to display a front license tag. Arrington presented license, registration, and temporary tags. In the course of that contact, one of the officers, Martin Yates, spotted a clear plastic bag that appeared to contain cocaine residue. Yates's partner, John Daniels, then asked Arrington to step out of the vehicle. Arrington refused. When Daniels reached inside the vehicle to physically extract Arrington, Arrington put his car in "drive" and sped off, dragging Daniels seventy-five yards through an intersection. The officer's contact with the pavement was so violent that his handcuffs left gouge marks in the pavement and were torn from his belt. Mercifully, Daniels finally tumbled free. He picked himself up and hurried back to his police cruiser, in which he and his partner then gave chase.

Fleeing the scene at high speed, Arrington lost control during a left turn and crashed into a median. Arrington, a thrice-convicted felon carrying a .380 caliber pistol with a full clip,

climbed out of his wrecked car and ran into a residential yard. Daniels and Yates exited their cruiser and pursued on foot. An off-duty police officer, Sergeant Rick Murray, saw the crash and joined the chase. Arrington easily vaulted over two fences but then failed to surmount a third, taller fence. As Arrington tried again to climb the third fence, Officer Daniels caught up with him and pulled him from the fence, and a struggle ensued. Murray, the off-duty officer, joined the melee. Both Murray and Yates reported seeing Arrington push Daniels away with his left hand and then fire a shot point blank into Daniels's face with his right hand extended. In the light from the muzzle flash, Yates saw the shiny gun. Murray grabbed Arrington's right arm and wrapped him in a bear hug, and both men fell to the ground. Daniels fell back against the fence. He went down to his knees, tried to rise, and discovered he could not. He remained slumped against the fence.

Not surprisingly, there was much screaming and commotion. Officers and civilian witnesses alike report having heard repeated commands, screams, and curses. "Let go of the gun; let go of the damn gun."[1] "Drop the fucking gun, get the gun."[2] "Where's the gun? Drop the gun."[3] "He's too strong. I can't

---

[1] Civilian witness Runako Ellerby, resident of a back apartment on 13th Street, NW. Mr. Ellerby said the officers surrounded the suspect after he "heard the gun go off." He could see several police officers "struggling with [Arrington] trying to disarm him." They said, "Let it go drop the damn gun," as they "repeatedly attempt[ed] to get him to release the weapon." Sergeant Moser, summarizing the debriefing statements of Yates and Murray, recalled the same words.

[2] Officer Daniels's recollection of what he heard as he lay slumped against the fence.

[3] Civilian witness Louis Price, resident at 1223 Missouri Ave., NW #4. He was awakened by voices outside his window and then heard a "pop" sound. He looked out and saw what he thought was a police officer struggling with a man on the ground. The officers appeared to be trying to retrieve something from the man.

get the gun away from him."[4]  "Don't leave me, I don't have a gun, you gotta come back here, this guy will kill us."[5]  "Get the gun out his hands; get the gun out of his hands."[6]

Yates had entered that dark yard just in time to see his partner shot.  He drew his weapon.  Murray and Arrington crashed to the ground, but Arrington was "trying to raise [himself] off the ground, thrusting his hips around and his shoulders."  Murray urged Yates to shoot Arrington.  He explained that he was "scared to death[] and . . . just knew that if [Arrington] got up, he was going to kill one of us."  Yates placed his gun against Arrington's head and took up the slack in the trigger mechanism.  Whether Arrington heard the gun cock or merely felt the vibration, he stopped moving for a few seconds.  His arms remained beneath him, close to his body, very tight.  Arrington had stopped moving violently, but he continued to resist.  Because Murray and Arrington were entangled, Yates did not shoot and settled for using the side of his weapon to strike Arrington.  Yates hit Arrington repeatedly.  It was "violent" and "fast," but he failed to gain Arrington's compliance.  Arrington "never went unconscious"; rather, he "fought the whole time,"[7] rolling and moving.  Asked why he hit Arrington repeatedly, Yates was clear: "I was determined to put myself in a position where either [Arrington was] going to go unconscious or I was going to have to shoot him . . . ."  He reasoned that if Arrington was allowed to get to his feet, still armed, with a weapon he had already used, "that would just invite him to shoot again."

---

[4] Officer Yates's recollection of what Murray said.  According to Yates, Murray was excited and yelling.

[5] Sergeant Murray's plea to Officer Yates.

[6] Civilian witness Tiyon Smith, who reports hearing the police say this immediately after he heard a single gunshot.

[7] Murray's Dep. 37:4-5, Nov. 4, 2004.

Other officers arrived.  Officer Kidd joined the fray, using his police baton.  Officer Peer, with his police dog Lazer on his lead, repeatedly told Arrington to "give up the gun or I'm going to put the dog on [you]."  Arrington did not respond, so the dog was instructed to perform controlled bites of Arrington exposed leg, which it did.  Soon after Lazer went to work, Sergeant Murray announced he had the gun.  Murray pulled Arrington's right hand out and stripped the gun from it, tossing it four or five feet away from Arrington.  Then, releasing a scream of adrenalin-induced exultation, Murray walked a few paces away.  Officer Kidd was able to get control of Arrington's left arm.  Together, he and Yates handcuffed Arrington.

Given the nature of the confrontation—a frantic and desperate struggle in the dark—the sequence of events emerges with remarkable clarity, and the physical evidence—right down to the gouge marks from Officer Daniels's handcuffs—is completely consistent with the officers' descriptions of what happened, as well as with radio transmissions that provided virtually a moment-by-moment commentary.

There is but one rip in this seamless web:  Arrington's version of events.  According to Arrington, he sped off from the initial traffic stop because the officers had drawn their weapons (or looked like they might).  He was also in possession of a gun and knew this violated his parole.  Officer Daniels was nowhere near the car, Arrington asserts, and certainly was not being dragged through the streets.  Arrington claims he was scaling the fence with the gun in his hand in order to dispose of the gun, but that when Daniels pulled him off the fence and then slammed him, face first, back into it, he dropped the gun.  Officers then took him down to the ground and handcuffed him.  Next, he heard a "pop" sound.  When he heard the pop, the gun was already on the ground; Arrington claims he dropped it "way before" he heard the pop.  He also saw a flash, and he thought he

had been shot. He contends that, as he lay on the ground handcuffed, disarmed, and helpless, the officers pistol-whipped him, beat him with a baton, kicked and punched him, and finally released the dog to attack his leg.

II

The majority identifies one material issue in dispute: "whether, as appellees contend, force was used to subdue appellant while he was armed and before he was in handcuffs, or whether, as appellant contends, he was beaten by police officers after he was captured, restrained, disarmed, and hand-cuffed." Maj. Op. 11. The majority insists, with respect to this issue, that the court may not determine credibility, and that therefore Arrington's sworn testimony that the officers continued to attack him *after* he was handcuffed, no matter how self-serving and implausible, entitles him to a jury trial. Maj. Op. 15. But the judge's role in deciding a motion for summary judgment is more robust and flexible than the majority conceives.

To defeat summary judgment, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); the party "must offer some hard evidence showing that its version of the events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While it is admittedly not the duty of district courts to weigh the credibility of the parties' testimony at the summary judgment stage, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much

of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted). Therefore, we have held that summary judgment "is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) (emphasis added); *see also Law v. Va. Stage Lines*, 444 F.2d 990 (D.C. Cir. 1971).

The sequence of events, according to Arrington's account, began with an officer slamming him into the fence, causing him to drop the gun he was carrying. An officer then forced him to the ground and handcuffed him. Next, he heard a "pop," after which officers beat him. Finally, he felt the dog "ripping" his leg; "[t]he dog was like tearing my leg up." No other witnesses corroborated Arrington's account. Two officers reported seeing the muzzle flash at the end of Arrington's extended arm. These officers and others described their subsequent efforts to disarm Arrington, who remained unrestrained—descriptions corroborated by contemporaneous radio transmissions and by civilian witnesses who reported a struggle during which police sought to "disarm" or "retrieve something from" Arrington.

Nor does the physical evidence support Arrington's assertion that the gun somehow fired spontaneously from the ground long after he had dropped it. No tests conducted on the gun were able to cause it to fire without the trigger being pulled. More significantly, Daniels was shot in the face. If Arrington

dropped the gun before he was handcuffed, as he claims, and then, after he was handcuffed, the gun fired spontaneously while it was lying on the ground, the bullet could not have turned at a 90 degree angle to strike Daniels in the face. Thus, in order for the jury to rule in Arrington's favor, it would have to conclude that Arrington's enchanted gun not only fires of its own volition but also fires magical bullets that can turn somersaults in midair. Bullets behave in this fashion in cartoons; in real life, though, bullets do not start, stop, and change directions. This is a law of physics, not a question of credibility.

Moreover, it is not clear which officer could have handcuffed Arrington at the time he claims he was handcuffed. Officer Daniels did not possess the means to do so. The handcuffs from his duty rig had been torn from his belt when he was dragged by Arrington's car, and they remained lying in the street. The second set, still in its case, was recovered from Daniels's personal belongings when he was taken to the hospital. Sergeant Murray, the only other person involved in the initial confrontation, was off duty, wearing sweats, and had no police equipment with him. Other officers did not reach Arrington until after Daniels was shot.

There is simply no evidence in the record that corroborates Arrington's self-serving account. In fact, everything in the record, including the physical evidence and the testimony of several civilian witnesses, contradicts Arrington's account. When a plaintiff relies entirely on his own self-serving testimony, which lacks any corroboration and is contradicted by all the available physical evidence, a court is not obligated to reward the plaintiff with a jury trial. *Johnson*, 883 F.2d at 128. Rather, "when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations . . . and dismiss the claim." *Jeffreys*, 426 F.3d at 555 (alterations in original) (internal

quotation marks omitted) (quoting *Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998)). To hold otherwise is to license the mendacious to seek windfalls in the litigation lottery. Under the majority's rule, a plaintiff can obtain a jury trial simply by testifying to the allegations in his complaint, no matter how implausible they might be. The uncertainty and expense of a jury trial will then frequently lead to nuisance settlements in claims that should be defeated on summary judgment. Arrington's suit is a case in point. Considering what occurred here, Arrington should be thankful the officers spared his life; instead, he has sued, and the majority thinks his odd and fanciful assertions are persuasive enough to be heard by a jury.

The majority apparently takes the position that if there is any evidence in the record, from any source, from which some tenuous inference can be drawn in favor of the nonmoving party, summary judgment is improper. The import of *Anderson*, *Jeffreys*, and *Johnson* is clearly otherwise. The question is not whether *any* evidence supports the nonmoving party's assertions; rather, there must be evidence on which a jury could reasonably find in that party's favor. *Anderson,* 477 U.S. at 248-49; *Jeffreys*, 426 F.3d at 554; *Johnson*, 833 F.2d at 128. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any *genuine* factual issues that properly can be resolved only by a finder of fact because *they may reasonably be resolved in favor of either party*." *Anderson*, 477 U.S. at 250 (emphasis added). Therefore:

> [Judges are no] longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof. . . . [The question is] not whether there is literally no evidence [supporting the nonmoving party], but whether there is any

> upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

*Id.* at 251 (internal quotation marks omitted) (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

The majority relies on *Greene v. Dalton,* 164 F.3d 671 (D.C. Cir. 1999), for the proposition that summary judgment is improper if the parties' sworn statements are in material conflict. I read *Greene*, however, as staking out a more limited ground: that a court may not grant a motion for summary judgment when reasonable minds could differ as to the import of the evidence. The sexual harassment allegations in *Greene* were claims which a reasonable jury could have resolved either way—a quintessential jury question. Here, by contrast, only a runaway jury could return a verdict for Arrington based on his testimony as to what occurred, and if a jury did return such a verdict, appellees would be entitled to a directed verdict. Because I agree with the trial court that appellees are entitled to prevail on summary judgment, I respectfully dissent.