# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 9, 2017          Decided June 20, 2017

No. 16-5284

UNITED STATES OF AMERICA, C/O UNITED STATES
ATTORNEY'S OFFICE,
PLAINTIFF-APPELLEE

v.

SEVENTEEN THOUSAND NINE HUNDRED DOLLARS
($17,900.00) IN UNITED STATES CURRENCY,
DEFENDANT

JOYCE COPELAND AND ANGELA RODRIQUEZ,
CLAIMANTS-APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00368)

---

*Christa Laser* argued the cause and filed the briefs for appellants. *Christopher Landau* entered an appearance.

*Christopher B. Brown*, Assistant U.S. Attorney, argued the cause for appellee United States of America. With him on the brief were *Elizabeth Trosman* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, TATEL and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This is a civil-forfeiture case, which is why the plaintiff is the United States of America and the defendant is a pile of cash. The government claims that the cash is subject to forfeiture because it is connected to the "exchange [of] a controlled substance," *i.e.*, drug trafficking. 21 U.S.C. § 881(a)(6). Appellants, themselves flesh and blood, have intervened in this action, offering sworn testimony that the money is theirs and wholly unrelated to drugs. According to the government, that testimony is so implausible that appellants lack Article III standing to intervene. The district court, deciding the issue on summary judgment, agreed. We reverse. At summary judgment, claimants alleging an ownership interest need only make an assertion of ownership and provide some evidence of ownership to establish standing. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we conclude that appellants met their burden.

## I.

The practice of civil forfeiture allows law enforcement to seize property and then seek permanent forfeiture in a civil proceeding *in rem*—meaning, in a proceeding against the property—all without so much as charging the owner with a criminal offense. *Leonard v. Texas*, No. 16-122, slip op. at 2 (U.S. Mar. 6, 2017) (Thomas, J.) (statement respecting the denial of certiorari). Though rooted in an English Law tradition that operated "under the fiction that the thing itself, rather than the owner, was guilty of the crime," contemporary civil forfeiture in the federal system is a creature of statute, the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure. *Id.* at 4 (citing *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 684–85 (1974)); *see United States v. $133,420*, 672 F.3d 629, 634 (9th Cir. 2012).

The typical forfeiture action begins when the government files a verified complaint against the property specifying, among other things, "the statute under which the forfeiture action is brought" and "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supplemental Rule G(2). As plaintiff, the government bears the ultimate "burden of proof . . . to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

Although the initial parties to the proceeding are the government and the property, "[a] person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Supplemental Rule G(5)(a)(i). A claim, in turn, must identify the property and claimant, state the claimant's interest in the property, and be signed by the claimant under penalty of perjury. *Id.*

"Unlike in typical civil proceedings, the government may commence limited discovery immediately after a verified claim is filed." *$133,420*, 672 F.3d at 635. Under Supplemental Rule G(6)(a), "[t]he government may serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." These same rules provide that the "government may move to strike a claim . . . because the claimant lacks standing" and that such a motion "may be presented as a motion for judgment on the pleadings

or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supplemental Rule G(8)(c).

This case traces its roots back to March 28, 2014, when an Amtrak passenger mistakenly removed another person's backpack from a train at Washington's Union Station. Later that day, he opened the backpack to find a shopping bag containing $17,900 in cash. Commendably, he turned the backpack over to Amtrak police.

In addition to the money, Amtrak police officers found inside the bag a student notebook and other personal effects. One of the papers contained the name Peter Rodriguez, as did the train manifest. A police narcotics dog alerted to the backpack, suggesting the presence of drug residue.

Using a contact number from the manifest, a detective with the Metropolitan Police Department called Peter Rodriguez, who gave a detailed description of the contents of the backpack—except for the money. Twice asked whether there was money in the backpack, Peter said no. Later, the detective called Peter to inform him that currency was found in the backpack, and that the bag—sans cash—could be recovered from Amtrak, though the money would remain with the MPD Asset Forfeiture Unit.

Shortly thereafter, appellant Angela Rodriguez, Peter's mother, contacted MPD, explaining, according to the government's verified complaint, that the cash belonged to her and her domestic partner, appellant Joyce Copeland, who lives with her in New York City. The couple, she recounted, had left the money in a bag in Peter's apartment, but neglected to tell him that it contained currency. When Peter later announced that

he was coming to New York to visit his mother, she told him to bring the bag along.

Unconvinced by Ms. Rodriguez's story, the police formally seized the currency and turned it over to the DEA, which initiated administrative forfeiture proceedings. *See* 18 U.S.C. § 983. The couple participated in that process, filing claims of interest and providing some documents to support their claim. Still unmoved, the government commenced this case on March 13, 2015, by filing its complaint seeking forfeiture of the money as drug related. 21 U.S.C. § 881(a)(6).

After the couple filed verified claims asserting their ownership interests in the money, the government served special interrogatories asking them to: describe, in great detail, how they came to acquire the money; provide records and other information supporting their account; and explain how Peter came to possess the money.

In their responses, sworn under penalty of perjury, the couple stated that they amassed the cash over time—with advance payments of federal tax refunds, a transfer from a retirement account, the sale of a pair of mink coats, and by other means—and stored their savings in a locked file cabinet. With plans to eventually move from New York to North Carolina, where Peter lives, and to purchase a home there, the pair drove south with cash in excess of $17,900. Along with using the money to pay for trip-related expenses like food and gas, they hoped to buy a used vehicle so that each would have a car to drive after they relocated. Once in North Carolina, they stayed in Peter's home and visited several open houses. On February 26, the couple returned to New York, cutting their trip shorter than expected because one of them called her doctor in New York and learned that she had a medical procedure scheduled. Before driving back, Ms. Rodriguez decided to

leave a bag holding the currency in Peter's home "because [the couple] intended to return to North Carolina within a short period of time to continue the search for housing and a car." She "did not provide Peter Rodriguez any information about the amount of the [cash] because [she] believed Peter might have taken some of it had he known it was in the bag." It was on March 28, about a month after the pair left North Carolina, that Peter's backpack was mistakenly removed from the train.

With the record composed of little beside this testimony and the verified complaint, the government moved to strike the couple's claims for lack of standing under Supplemental Rule G(8)(C)(i)(B). The district court, finding that "no reasonable jury could believe the Claimants' bizarre explanation for how they came to own the $17,900," granted the government's motion for summary judgment. *United States v. $17,900*, 200 F. Supp. 3d 132, 134 (D.D.C. 2016). Our review is de novo. *See Citizens for Responsibility and Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 184 (D.C. Cir. 2013) (explaining that review of a district court's grant of summary judgment is de novo).

## II.

When the government moves to strike a claim for lack of standing, a claimant has the burden to establish standing by a preponderance of the evidence. Supplemental Rule G(8)(c). To prevail, "a claimant must meet both Article III and statutory standing requirements." *United States v. $487,825*, 484 F.3d 662, 664 (3d Cir. 2007). In this appeal, the government challenges only the former.

As our court has explained, "[t]he requirements for a [claimant] to demonstrate constitutional standing to challenge a forfeiture are very forgiving." *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015) (alterations omitted). "In

general, any colorable claim on the property suffices," *id.*— typically, an ownership or possessory interest, *see, e.g., $133,420*, 672 F.3d at 637. "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." *United States v. $515,060.42*, 152 F.3d 491, 497 (6th Cir. 1998); *c.f. Town of Chester v. Laroe Estates, Inc.*, No. 16-605 (U.S. June 5, 2017), slip op. at 6 ("[A]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing.").

As always, standing "must be supported . . . with the manner and degree of evidence required at [each] successive stage[] of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, a claimant need only *allege* a colorable interest in the property. *$133,420*, 672 F.3d at 638; *see Emor* 785 F.3d at 676. "In response to a summary judgment motion, however, the [claimant] can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

Although our court has yet to articulate precisely "the manner and degree of evidence required," *id.* at 561, for a claimant to survive the summary judgment stage of a civil-forfeiture proceeding, other circuits have. For example, the Seventh Circuit has that held that where, as here, a claim is predicated on an ownership interest, "an assertion of ownership combined with some evidence of ownership is sufficient to establish standing." *United States v. $239,400*, 795 F.3d 639, 642–43 (7th Cir. 2015). The Ninth Circuit has adopted the same standard: "[a] claimant asserting an ownership interest in the defendant property . . . must . . . present 'some evidence of

ownership' beyond the mere assertion in order to survive a motion for summary judgment." *$133,420*, 672 F.3d at 639; *see also United States v. $148,840*, 521 F.3d 1268, 1276 (10th Cir. 2008) (same); *United States v. $81,000*, 189 F.3d 28, 35 (1st Cir. 1999) (same); *United States v. $38,570*, 950 F.2d 1108, 1112 (5th Cir. 1992) (same).

Both the government and the couple agree that the "some evidence" standard is appropriate, and this case is a fine example of why.

For one thing, because the case concerns cash, it demonstrates how challenging it can be to document ownership of property seized by law enforcement. Indeed, the very qualities that make paper money useful for illicit activity—in particular, its untraceability—often make it difficult to prove that any cash is legitimate, no matter its source. This is especially true for those in our society who rely on cash to the exclusion of banking and other financial services. As Justice Thomas has recognized, it is "the poor and other groups least able to defend their interests in forfeiture proceedings" who bear the brunt of civil asset forfeiture. *Leonard*, slip op. at 4 (internal citation omitted). And it is these same groups that are "more likely to use cash than alternative forms of payment, like credit cards, which may be less susceptible to forfeiture." *Id.*; *see* Federal Deposit Insurance Corporation, *National Survey of Unbanked and Underbanked Households* 16 (Dec. 2009), https://goo.gl/g3JtKe (finding that low-income, black, and Hispanic households, and those with a householder that is a foreign-born noncitizen, are more likely to be "unbanked"—to go without use of banking or similar financial services). So especially when cash is at issue, requiring more than "some evidence" of ownership would be onerous, unfair, and unrealistic.

A more demanding standard would also run up against the limited opportunity claimants often have to develop the record when the government moves to strike for lack of standing. In this case, for example, the record consists, in essence, of nothing more than the government's verified complaint and the couple's responses to the government's special interrogatories. Although the district court treated the government's motion to strike as one for summary judgment, it never held an evidentiary hearing, nor did the parties engage in the broad discovery typical in civil cases. Asking for more than "some evidence" of ownership on such a record would risk unduly excluding those with a "colorable claim" on the property. *Emor*, 785 F.3d at 676.

Finally, the "some evidence" standard preserves the important distinction between constitutional standing and the merits. Although claimants bear the burden of establishing standing, it is the government that bears the burden to prove, on the merits, "that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). As the First Circuit has cautioned, "[c]ourts should not . . . conflate the constitutional standing inquiry with the merits determination that comes later." *United States v. One-Sixth Share of Mass Millions Lottery Ticket*, 326 F.3d 36, 41 (1st Cir. 2003). Where, as here, a claimant's account of ownership is irreconcilable with the theory upon which the government seeks forfeiture, requiring the claimant to produce more than "some evidence" of ownership runs the danger of impermissibly shifting the merits burden to the claimant— tantamount to, say, making a claimant prove that her property is *unconnected* to unlawful activity. Indeed, that is exactly what the government seeks to do here: at oral argument, government counsel suggested that the couple lacks Article III standing because their claimed ownership interest is undercut by "the record evidence" indicating that "this is drug trafficking money." Oral Argument at 18:40–18:55. Understandably, the

government would prefer to try its merits case against an inanimate object. We think it "obvious," however, that "a claimant [who has shown some evidence of ownership] risks injury within the meaning of Article III and thus may have his day in court." *$148,840*, 521 F.3d at 1276.

## III.

Having determined what claimants must show in order to establish standing, we can easily resolve what remains of this appeal by applying well-worn principles of summary judgment.

Summary judgment is appropriate only "if the movant"—here the government—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view[] the evidence in the light most favorable to the nonmoving party"—here the couple—and "draw[] all reasonable inferences in [its] favor." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). In so doing, the court "may not make credibility determinations or otherwise weigh the evidence." *Id.* And "if one party presents relevant evidence that another party does not call into question factually, the court must accept the uncontroverted fact." *Id.*

Rule 56 of the Federal Rules of Civil Procedure expressly provides that a party opposing summary judgment may support its factual positions using "affidavits or declarations" and "interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). So long as an "affidavit or declaration" is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated," it may be "used to . . . oppose a motion" for summary judgment. *Id.* at 56(c)(4).

In this case, the couple has offered sworn testimony detailing how they amassed the money, why they transported it to North Carolina, and how it ended up in Peter's hands. In fact, there is little in the record *other* than their declarations. Certainly, nothing in the record directly contradicts the pair's sworn account—no evidence that they did not travel to North Carolina, for instance, nor evidence that the cash had another source. Given our responsibility to "view[] the evidence in the light most favorable" to the couple and to "accept . . . uncontroverted fact[s]," *Johnson*, 823 F.3d at 705, we have little trouble concluding that the couple has asserted ownership and offered "some evidence" of ownership sufficient to withstand summary judgment.

The government insists that the couple has done no more than simply *assert* ownership. In its view, they failed to meet their burden to produce "some evidence" of ownership when they "offered *no* evidence, beyond their own words, to substantiate" their story. Government Br. at 34. Had the couple offered only a bare assertion that they owned the property, we might agree. But as explained above, the two did more, submitting extensive sworn testimony as evidence of their claim. Just as Rule 56 provides, a party may oppose summary judgment with sworn testimony, and—as we have recognized—that party's own sworn testimony can alone defeat summary judgment, *see, e.g.*, *Johnson*, 823 F.3d at 710 (recognizing that a party's testimony will always in some sense be "self-serving," but that "parties, like other fact witnesses, are legally competent to give material testimony" and in certain contexts may be "the key, or even sole, witnesses"); *Arrington v. United States*, 473 F.3d 329, 337–38 (D.C. Cir. 2006) (denying summary judgment where a non-movant's affidavit created a genuine issue of material fact). Summary judgment turns not on whether a party offers a particular form of evidence, but rather on whether the evidence a party does

submit creates a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c)"); Fed. R. Civ. P. 56(c) (listing "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

The government urges us to "reject" the couple's testimony as "facially implausible." Government Br. at 25. On this point, it bears repeating that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and are thus inappropriate at summary judgment. *Anderson*, 477 U.S. at 255. "This is the standard even when the court entertains grave doubts about" a "statement[] proffered by the party opposing summary judgment." *Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999). The government nonetheless contends that we can set aside the couple's account because it "strains credulity," involving "numerous improbable elements":

> that [the couple] stockpiled thousands of dollars in cash in their apartment for as long as 14 months rather than secure their savings in bank accounts; hand-carried the bag containing more than $17,900 on the drive from New York to North Carolina; and chose to pay all expenses [on that trip] in cash rather than utilize their financial accounts; and . . . became so worried about managing currency on their return trip that they risked entrusting their savings to an individual they believed would steal the money if he discovered it.

Government Br. at 36.

13

The government's argument perfectly illustrates why credibility determinations and the weighing of evidence are left to juries rather than judges. Government counsel may well be able to convince judges that it is inconceivable someone would choose to keep sizeable cash savings, to travel with cash, or to pay for routine expenses using cash rather than a credit card, but a jury of laypeople with different and more diverse life experiences might view these very same choices with considerably less suspicion. "Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343–44 (1979) (Rehnquist, J. dissenting). We are thus especially reticent to circumvent the jury process and throw out sworn testimony because it is out of line with our own lived experiences.

Rather, our cases describe narrow circumstances under which courts may "lawfully put aside testimony [because it] is so undermined as to be incredible." *Robinson v. Pezzat*, 818 F.3d 1, 10 (D.C. Cir. 2016). As we recently explained in *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017), this situation usually comes into play "when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Id.* at 747. Here, however, the record contains scarcely any evidence aside from the couple's testimony, let alone evidence that undermines their account or suggests deliberate perjury. And while one might well discount as unlikely the pair's testimony about leaving their savings in a bag in Peter's home, without telling him, only to later reverse course and ask him to bring the bag to New York, that story is far from "physically impossib[le]." *Id.*

The government cites a series of cases in which, it says, courts have thrown out analogous sworn testimony. All are distinguishable. Two of the cited cases concern testimony that was riddled with internal contradictions central to the case. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (setting aside "contradictory and incomplete" testimony); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468–71 (S.D.N.Y. 1998) (Sotomayor, J.) (same). Another dealt with a statement "blatantly contradicted" by video evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The government's reliance on *United States v. $8,440,190*, 719 F.3d 49 (1st Cir. 2013), in which the First Circuit dismissed a claimant for lack of Article III standing, is equally misplaced. There, a Coast Guard boat, while making chase on a suspicious vessel, saw "numerous bales" thrown "overboard." *Id.* at 51–52. Although some bales were never recovered, the ones that were contained roughly $8.4 million. When questioned, a crewmember on the fleeing vessel claimed that he had been paid to transport the bales of money. *Id.* at 52. But in a subsequent action for asset forfeiture, the crewmember changed his tune, filing a verified claim for all $8.4 million. *Id.* at 53–54. In support of his claim, the crewmember offered only a "conclusory" affidavit "in which he referred to the bales as 'my bales'" and stated that he "intended to go back and retrieve" them from the sea. *Id.* at 58–59. Dismissing his claim, the First Circuit observed that the crewmember's new story "defie[d] common sense," as the bails lacked any feature that would keep them "floating in place," which explains why many "presumably s[ank] or float[ed] away." *Id.* at 59. From this, the government asks us to read the First Circuit as holding that courts may set aside sworn testimony that is "inconsistent with common sense." Government Br. at 26 n.6.

In truth, that decision falls squarely within the bounds for setting aside self-serving and uncorroborated testimony that we spelled out in *Chenari*: where such testimony is "undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." 847 F.3d at 747. Specifically, (1) the record contained contradictory evidence that undermined the crewmember's claim—namely, his prior testimony; (2) the change in the crewmember's account raised an inference of fabrication; and (3) the claimant's story had an element of physical impossibility—after all, the money sank. In addition, the court emphasized that the crewmember's affidavit evidence was minimal bordering on conclusory, as any explanation of how he acquired the money and why it was on the vessel was missing. *$8,440,190*, 719 F.3d at 58–59; *see Greene*, 164 F.3d at 675 (While "statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule"). This case differs in every respect: the record is devoid of contradictory evidence, the couple has consistently maintained that the money is theirs, nothing in their account is physically impossible, and—far from conclusory—the couple has explained how they came to own the money in considerable detail.

Given all this, we believe that the couple has more than met its burden to establish constitutional standing at summary judgment. Our decision means only that the pair has a right to contest whether the money is subject to forfeiture. Despite the government's best efforts, this will remain an adversary proceeding.

**IV.**

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

*So ordered.*