# United States Court of Appeals
## For the First Circuit

No. 11-1611

UNITED STATES,

Plaintiff, Appellee,

v.

$8,440,190.00 IN U.S. CURRENCY,

Defendant In Rem,

ROBERT HOVITO VAN BOMMEL DUYZING,

Claimant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Howard, Lipez, and Thompson,
Circuit Judges.

Ramón M. Gonzalez, with whom Luis Rafael Rivera was on brief, for appellant.
Myriam Yvette Fernández-González, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

June 17, 2013

**THOMPSON, <u>Circuit Judge</u>**.  While fleeing from the Coast Guard aboard a go-fast vessel, the claimant Robert Hovito Van Bommel Duyzing ("Van Bommel") and his crew tossed approximately $8 million into the Caribbean Sea.  The money was recovered by the Coast Guard and the government filed this action seeking to have the currency, along with some additional money found on the crew members' persons, forfeited to the United States. Van Bommel tried to put a stop to this, claiming that the money was his.  The district court dismissed his claim on summary judgment and Van Bommel now appeals.  After careful review, we affirm in part and reverse in part.

**BACKGROUND**

**A. The Interdiction**

In the late evening hours of June 20, 2009, the United States Coast Guard cutter Harriet Lane was conducting a routine patrol in the waters off of Panama when the crew began tracking a nearby small, fast-moving vessel.  A helicopter was launched from the Harriet Lane to initiate visual and radar contact.  It was determined that the boat was a go-fast vessel of approximately forty feet in length that had four persons on board, four engines, and no masthead, stern light or sidelights visible as required by maritime regulations.  The Coast Guard crew's suspicions were aroused and so the helicopter approached the vessel, which was located in international waters, and fired three warning shots as

an order to stop.  The vessel did not heed the warning and it took

a round of disabling fire from the helicopter to bring the vessel

to a halt.  The helicopter crew witnessed the individuals aboard

the go-fast vessel throwing numerous bales overboard.

An inflatable boat was launched from the Harriet Lane and

Coast Guard crew members headed to the disabled boat.  They boarded

to find four men, one of whom is the claimant in this case, Van

Bommel.[1]   The boat, which contained none of the tell-tale

indicators of a vessel's nationality, was determined to be

stateless after contact was made with Panamanian authorities.[2]

Surface samples were taken from the boat, revealing that certain

areas had been in recent contact with cocaine.

The jettisoned bales, which had been marked by the

helicopter's crew with strobe lights and a data marking buoy, were

found floating in the sea (six bales were never found; it seems

they may have sunk or drifted away).  The Coast Guard scooped them

up.  There were approximately twenty-one bales total, all of

similar shape and size, as well as a plastic package containing a

loaded semi-automatic handgun and ammunition.  Aboard the Harriet

Lane, thirteen of the bales were opened.  Each contained roughly

---

[1] The other crew members were Arnaldo Henao-Serna, Manuel
Carrascal-Reales, and Abraham Carrascal-Carrascal. All, including
Van Bommel, were from Colombia.

[2] It is unclear whether the Panamanian authorities were
contacted simply because the boat was found near the Panama coast
or because the crew reported it as being Panamanian.

$400,000 putting the preliminary estimate of recovered currency at $8.4 million.

Van Bommel and his three companions, who had also been transferred to the Harriet Lane, were advised of their rights and interviewed. Van Bommel stated that he was offered $40,000 to transport the bales of money and was paid $10,000 of it up front. Consistent with his story, Van Bommel had $10,000 cash on his person as did each of his associates. Van Bommel also told Coast Guard officers that he and his crew had tossed the bales overboard when they saw the helicopter.[3]

### B. Van Bommel Talks with Law Enforcement

About a week later, on June 29, Van Bommel was again interviewed by law enforcement officials and he continued talking. Van Bommel said that while drinking at a bar on San Andres Island, he and his three crew members met a man named Tomas (last name unknown). After the group hung out a few times, Tomas cut to the chase. He wanted the four men to participate in a smuggling venture that would involve them moving bales of money from one area of Panama to another. Van Bommel said Tomas then made arrangements

---

[3] The government claims that Van Bommel indicated that he threw the bales overboard to sink them; Van Bommel says he made no such admission. Another point of disagreement: the government alleges that Van Bommel made other incriminating statements, tying himself and the others to illegal endeavors such as drug and weapons trafficking. Van Bommel denies this. This dispute is not material for our purposes.

for all four men to be transported from San Andres Island to Boca de Toro, Panama to board the go-fast vessel.

Also on the day of his interview, June 29, Van Bommel signed U.S. Immigration and Customs Enforcement ("ICE") forms titled "Notice of Abandonment of All Rights and Interest in Property" (the "notices of abandonment"). One form pertained to the twenty-one bales and the other to $10,000 in currency (indubitably the $10,000 found on Van Bommel's person).[4] The forms contained an "Acknowledgment and Abandonment of Claim" that stated:

> I understand that I have a right to assert a claim in the seized property described above and to seek return of the property. With full knowledge of those rights, I hereby abandon any and all claims I may have to that property. I waive my right to receive notice of future administrative or judicial proceedings involving the property. I also waive any further right to contest the administrative or judicial forfeiture of the property described above.

Van Bommel signed the notices of abandonment, both for the twenty-one bales and the $10,000, and an ICE agent and Drug Enforcement Administration ("DEA") agent signed as witnesses.

### C. Criminal Charges

The same day he met with law enforcement, a criminal complaint was filed against Van Bommel (and his three cohorts). It alleged that Van Bommel, by failing to stop his boat when ordered

---

[4] The form we have pertaining to the twenty-one bales is in English and the form pertaining to the $10,000 is in Spanish. The forms, apart from being in different languages, look identical and appear to provide for the same thing. No party claims otherwise. We therefore treat both forms as containing the same terms.

to do so by the Coast Guard, had violated 18 U.S.C. § 2237, which makes it unlawful for an operator of "a vessel subject to the jurisdiction of the United States, to knowingly fail to obey" a federal law enforcement officer's order "to heave to that vessel" (in layman's terms, failing to slow down or stop). See 18 U.S.C. § 2237(a)(1), (e)(2). Van Bommel was ultimately indicted and pled guilty on December 22, 2009. Van Bommel was sentenced on February 4, 2010 to time already served and a three year term of supervised release was imposed.

### D. The Forfeiture Action

We backtrack a little. A few months earlier, on November 25, 2009, the United States filed this action, a verified complaint for forfeiture in rem as to $8,440,190. Relying on an affidavit completed by ICE agent Antonio Rivera, who participated in the investigation of Van Bommel, the government alleged that the $8,440,190 in currency was seized from Van Bommel and his accomplices, and the go-fast vessel that they were traveling on. The complaint indicated that the currency, which represented the $8,400,190 found in the bales and the $10,000 found on each crew member's person, was currently in the custody of the DEA, ICE, Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and the Federal Bureau of Investigation ("FBI"). The complaint asserted that the currency should be forfeited to the United States, see 46 U.S.C. § 70507, because it

was involved in a violation of the law, specifically the manufacture, distribution, or possession of a controlled substance on a vessel, see id. § 70503. On December 1, the district court ordered that a warrant of arrest in rem be issued for the seized currency. On that same day, the court granted the government's motion to seal the case.

Once Van Bommel and the others' criminal convictions were all wrapped up, the court ordered the forfeiture case unsealed. A week or so later, on March 19, 2010, Van Bommel filed a verified claim of ownership with the district court for $8,410,190 of the currency – representing all the money in the bales plus the $10,000 found on Van Bommel's person. The claim, after detailing the amount of money and where it was presently being held,[5] simply indicated that Van Bommel was the owner of the currency. He signed the document under the pain of perjury. That same day, Van Bommel filed a motion to dismiss the complaint. In essence, Van Bommel argued that the government had not established that he was involved in a drug smuggling venture and he also took issue with the timing of the complaint and the fact that it was sealed. Attached to the motion to dismiss were three more verified claims of ownership (one each pertaining to the $10,000, $4,200,000, and $4,200,190) that again simply averred that Van Bommel was the owner.

---

[5] It indicated that $10,000 was being held by the FBI, $4,200,000 by the DEA, and $4,200,190 by the CBP.

The government then filed an amended complaint, which Van Bommel moved to dismiss. He also filed an answer. Motion practice continued with the government moving for summary judgment. It argued that Van Bommel did not have Article III standing under the United States Constitution to challenge the forfeiture because he had no colorable interest in the seized currency. The government said Van Bommel's claim for the money should be stricken. Van Bommel objected, arguing among other things that he did have standing and that the district court lacked jurisdiction over the in rem action. Van Bommel reiterated his lack of jurisdiction argument in a motion to quash the arrest warrant in rem.

Given the various filings going back and forth, the district court decided that an evidentiary hearing was needed to flesh out the standing issue. The hearing took place on August 19, 2010. Though billed as an evidentiary hearing, neither side ended up offering factual evidence or testimony. Van Bommel, for his part, had by then been deported to Colombia.[6] The government had two agents at the ready to testify – the ones who interviewed Van Bommel and witnessed his signing the notices of abandonment – however they were never ultimately called. The attorneys did make

---

[6] Van Bommel's attorney, who also participated in Van Bommel's deportation proceeding, never filed a motion with the court or approached the prosecutor seeking to keep his client in the country for this evidentiary hearing. In fact, when the government sought to stay the deportation so that Van Bommel could be deposed, Van Bommel's counsel opposed it.

their pitches though. Van Bommel's argued that his client never intended to abandon the property - supposedly he planned to retrieve it from the sea later - and that Van Bommel's sworn claims of ownership were sufficient to establish standing. The government persisted that Van Bommel abandoned the property, pointing not only to the fact that he tossed it into the sea but also that he signed notices of abandonment. Van Bommel's attorney countered: he intended to go back for the bales and he only signed because he was not fully advised of his rights and was threatened with prosecution for drug smuggling. After a little more back and forth, the hearing came to a close.

A few months later,[7] on March 15, 2011, the district court issued its decision. It found that the claims of ownership filed by Van Bommel, which were unsupported by any evidence other than his affidavit, were inadequate. Van Bommel, it held, had also given up any right he might have had to the loot by signing the notices of abandonment. Because Van Bommel had not shown a colorable interest in the seized currency, the court concluded that he had failed to establish Article III standing to challenge the forfeiture. The government's motion for summary judgment was granted, and Van Bommel's claim of ownership and pleadings were

_____

[7] Van Bommel, in between the hearing taking place and the decision issuing, filed yet another motion to dismiss.

dismissed with prejudice.[8]  The court also dismissed Van Bommel's various motions to dismiss and motion to quash as moot.

## E. This Appeal

Van Bommel now appeals the district court's grant of summary judgment.  He advances two grounds: the district court did not have jurisdiction over a portion of the defendant currency, and the court erred in finding that he has no standing.

## ANALYSIS

## A. Jurisdiction

Van Bommel, though he never argued this below, contends that the warrant for arrest in rem pertaining to just the $4,200,190 in the custody of CBP was never executed.[9]  To support

---

[8] To be clear, this was a grant of partial judgment.  Full judgment in favor of the government on its forfeiture complaint was not granted at this time.  One of the other members of Van Bommel's crew, Henao-Serna, also had a claim pending that had to be sorted out.  When Henao-Serna ultimately failed to prosecute this claim, the court dismissed it.  With no claims left pending, the court (over a year after partial judgment was entered against Van Bommel) entered final judgment in favor of the United States and closed the case.

[9] Van Bommel raised a somewhat related argument below in his motion to quash, which the district court twice denied (once without explanation, and then again as moot based on its award of summary judgment to the government).  Van Bommel argued that the warrant of arrest in rem for the entire defendant currency, which was issued on December 1, 2009, was not timely executed because, according to the process receipt and return, it was executed on May 10, 2010, one-hundred and sixty-one days later.  Van Bommel averred that the one-hundred plus days did not satisfy the requirement of Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which requires that warrants in forfeiture in rem actions must be executed "as soon as practicable."  Rule G(3)(c)(ii).  However, as the government

this theory he claims that no return of service was filed for that portion of the money. According to Van Bommel, the failure of the government to execute a warrant for that part of the defendant currency results in the district court having no in rem jurisdiction over it. The government offers no response to this argument because it was not addressed by the district court. The government suggests that if we find standing we should remand to the district court to address this issue. We will not take the government's proffered approach. Van Bommel challenges the district court's jurisdiction and this court has an obligation to satisfy itself that the court had jurisdiction. See <u>Steel Co.</u> v. <u>Citizens for a Better Env't</u>, 523 U.S. 83, 95 (1998); <u>Sindicato Puertorriqueño de Trabajadores</u> v. <u>Fortuño</u>, 699 F.3d 1, 8 (1st Cir. 2012). And so we take up Van Bommel's argument, although it does not get him far.

Though Van Bommel says that the warrant was never executed for the $4,200,190 held by the CBP, we do not see any record support for this contention. While Van Bommel is not specific about what portion of the record he is relying on (in his

---

correctly noted in its opposition, this argument is without merit because Rule G specifically provides that the "as soon as practicable" requirement does not apply when "the property is in the government's possession, custody, or control" which the defendant currency was here. Rule G(3)(c)(ii)(A). When Van Bommel made this argument below he made no mention of his current assertion that the warrant was never executed as to the $4,200,190.

brief he simply says the "docket sheet" reveals that the warrant was never executed), we think it safe to assume that he is focusing on the Process Receipt and Return (the "process receipt") and so we take a close look at that. The process receipt, which is the same document that Van Bommel relied on to say that the warrant was not executed in a timely manner, indicates that the warrant of arrest in rem was served on the United States Marshals on May 10, 2010. We assume that Van Bommel is honing in on a section of the process receipt called "Special Instructions or Other Information That Will Assist in Executing Service." This section contains the following language: "Ten Thousand Dollars ($10,000.00) in U.S. Currency-09-FBI-004982" and "Four Million Two Hundred Thousand Dollars and Zero Cents ($4,200,000.00) in U.S. Currency 09-DEA-520362." There is no reference to the $4,200,190 held by the CBP. This omission, however, is not sufficient to establish that the warrant was never executed on the $4,200,190.

The defendant listed at the top of the process receipt is "$8,440,190.00 in U.S. Currency," in other words, the entire amount of the defendant currency. There is nothing to indicate that the special instructions section alters or in any way limits this amount. The type of process to be served is listed as the complaint, amended complaint, the warrant of arrest in rem, and an unspecified order (the most likely candidate being the court order granting the government's motion to issue the warrant). All of

-12-

these documents speak in terms of the entire $8,440,190. None of them excludes the $4,200,190. Indeed none of the documents even distinguish between, or parse out, the different amounts being held by the different government agencies, other than to say that the defendant currency is being held by various agencies.

The warrant of arrest in rem, in particular, provides that "a complaint has been filed in this Court praying for the forfeiture of the above captioned defendant property" and that "we do hereby command that you seize said defendant property, which is described in the caption of the complaint, and to detain the same in your custody until further order of the Court." The caption on the warrant, and on the complaint, reads "$8,440,190.00 in U.S. Currency, Defendant." The warrant of arrest in rem clearly calls for the arrest of the entire property. And there is nothing on the face of the process receipt to indicate that the warrant was not executed for all of the money. The fact that the special instructions, which are simply meant to assist in expediting service, do not reference the $4,200,190 held by the CBP does not clearly indicate that the warrant for that portion of the money was never executed.

That is all we need to say on this point. Because the record does not support the underlying premise that the warrant for arrest in rem for the $4,200,190 was never executed, we need not

get into the merits of Van Bommel's claim that the alleged failure to execute the warrant divests the district court of jurisdiction.[10]

## B. Standing

We move on to the main question on appeal: whether Van Bommel has constitutional standing under Article III to challenge the forfeiture.[11]  Van Bommel thinks the answer is yes, alleging that his verified claims of ownership are sufficient to give him standing to contest the entire $8,410,190 and that it is a disputed issue of fact whether he voluntarily abandoned the money or waived his right to it.  The government continues to contend that Van Bommel has not shown any possessory or ownership interest in any of the confiscated money.

Our review, since this case comes to us on a grant of summary judgment, is de novo.  Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012).  Facts are viewed in a light most favorable to Van Bommel, the non-movant; all reasonable inferences are also drawn in

---

[10] Van Bommel had a follow-up argument too.  He contended that if the government were to now attempt to fix its alleged failure to execute the warrant, it would be too late because the suit would be untimely.  Since we find no merit in his claim that the warrant was not executed, we do not need to get into this claim.

[11] Standing in forfeiture actions "has both constitutional and statutory aspects."  United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 40 (1st Cir. 2003).  The government only challenged Article III standing before the district court and the court deemed it uncontested that Van Bommel had statutory standing.  The government does not challenge that finding on appeal.  Therefore only Article III standing is at issue here.

-14-

his favor.  Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 52 (1st Cir. 2012).  Ultimately, summary judgment is called for when the movant, here the government, demonstrates that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Genuine issues are those capable of being resolved in favor of either party and material facts have the potential to impact the case's outcome.  Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010).

After careful review, we conclude that the answer to the standing question is different depending on which amount of money one is talking about - the approximately $8 million in the bales versus the $10,000 on Van Bommel's person.  We take the two groups of currency separately.

### i. The $8 Million in the Bales

In general, there are three components that must be satisfied for Article III standing: a concrete and particularized injury, a causal connection between that injury and the wrongdoer's conduct, and the likelihood that prevailing in the action will rectify the injury in some way.  Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 317 (1st Cir. 2012); United States v. U.S. Currency, $81,000, 189 F.3d 28, 34 (1st Cir. 1999).  "Standing is a threshold consideration in all cases, including civil forfeiture cases." United States v. One-Sixth Share of James J. Bulger in All Present

-15-

& Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 40 (1st Cir. 2003).

In forfeiture cases, the property is the defendant and therefore defenses against forfeiture can only be brought by a third-party intervenor, here Van Bommel, who generally must have independent standing.  See id.  When faced with a motion seeking to strike a claim, as Van Bommel is here, the burden is on the party contesting the forfeiture (the claimant) to establish standing by a preponderance of the evidence.  Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions G(8)(c)(ii)(B).  To have such standing, the claimant must start by demonstrating an ownership or possessory interest in the seized property.  One-Sixth Share, 326 F.3d at 41.  At the initial stages of intervention, the requirements are not arduous and typically "any colorable claim on the defendant property suffices."  Id. (addressing the claimants' standing at the motion to intervene/motion to set aside a judgement phase); see also U.S. Currency, $81,000, 189 F.3d at 35 (considering standing at the motion to dismiss stage); United States v. One Parcel of Real Prop. with Bldgs., Appurtenances & Improvements Known as 116 Emerson St., 942 F.2d 74, 78-79 (1st Cir. 1991) (deciding the claimant's standing at the motion to intervene stage).  An allegation of ownership, coupled with some evidence of ownership, is sufficient to establish constitutional standing to contest a forfeiture.  U.S. Currency, $81,000, 189 F.3d at 35.

-16-

This case comes to us not at the early stages of intervention but following a hearing that the district court ordered specifically to address the issue of standing.[12] This was a hearing that the court had every right to order as the burden is on the claimant to prove standing, see One-Sixth Share, 326 F.3d at 41 (explaining that the onus is on the party seeking to challenge the forfeiture to demonstrate the necessary ownership or possessory interest to establish standing), and the court was entitled to flesh out what evidence Van Bommel had, see, e.g., United States v. Union Bank for Sav. & Inv. (Jordan), 487 F.3d 8, 13 (1st Cir. 2007) (the district court held an extended summary judgment hearing to consider whether the claimant bank was the owner of the seized currency for standing purposes); U.S. Currency, $81,000, 189 F.3d at 37 (the district court sifted through evidence, including grand jury testimony of the claimant, to address whether he had an

_____

[12] We do not go so far as to say that a distinct test should be applied to civil forfeiture actions at the summary judgment phase. In fact, in United States v. Union Bank for Sav. & Inv. (Jordan), 487 F.3d 8, 22 (1st Cir. 2007), this court, in deciding whether summary judgment was properly granted, decided that a claimant had standing using the forgiving "colorable claim" requirement that is typically applied at the early stages of intervention. However, that case was very different from this one in that the court did not need to delve into the factual underpinnings of the claimant's ownership because it was undisputed that the money the government was seeking forfeiture of was seized from the claimant's bank account. See id. As we said, the court here actually ordered an evidentiary hearing to flesh out the standing considerations.

-17-

ownership interest for standing purposes). In short, Van Bommel's evidence was minimal.

In fact, the only evidence Van Bommel offered, in support of his verified claim for the money, was his own affidavit (proffered in connection with his summary judgment opposition) in which he referred to the bales as "my bales" and indicated that he concealed "my ownership of the defendant currency." This evidence of ownership, minimal in its own right, was contradicted by the other evidence on the record. Namely, the uncontradicted evidence, which came in the form of the affidavit from the ICE agent, that Van Bommel tossed the bales into the sea and told law enforcement that he was paid to move the bales for someone else as part of a smuggling venture. Van Bommel does not disagree that he did these things.

To be more specific, it is undisputed that Van Bommel twice affirmatively indicated to law enforcement that he was simply a paid courier, transporting someone else's money for them. Van Bommel went so far as to give specifics about how he came to transport this money (recall his story about Tomas and the bar on San Andres island). The $10,000 found on Van Bommel's person, along with the $10,000 each of his cohorts had, fit into the story he gave law enforcement. In fact, not one thing in the record suggests that the $8 million was really Van Bommel's except his own after-the-fact affidavit in which he made vague references to

owning the bale money.  Even crediting the conclusory, self-serving statements made in the affidavit, see SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11, 20 (1st Cir. 1999) (noting that conclusory, self-serving testimony need not be credited on summary judgment), the "'mere existence of a scintilla of evidence' in favor of the nonmoving party is insufficient to defeat summary judgment," Barreto-Rosa v. Varona-Mendez, 470 F.3d 42, 45 (1st Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  We do not have any more than that here.

Furthermore, Van Bommel abandoned the property by tossing it into the middle of open ocean.  His affidavit claim that he intended to go back and retrieve the bales defies common sense. Not only did Van Bommel toss the bales out in plain sight of a Coast Guard helicopter, but there is no indication in the record that the bales had any built-in feature that would keep them floating in place as opposed to sinking or drifting away.  In fact, six of the bales disappeared, presumably sinking or floating away themselves.  Again, more than a scintilla of evidence is called for here.  See Barreto-Rosa, 470 F.3d at 45.  And though Van Bommel persists that there is a factual dispute about whether he intended to abandon the money to the sea, this dispute is of his own making based solely on an after-the-fact affidavit that is uncorroborated by any evidence and, like we said, contradicted by common sense. Even viewing the facts in a light most favorable to Van Bommel, we

do not see a genuine dispute of material fact.  See Webb v. Lawrence Cnty., 144 F.3d 1131, 1135 (8th Cir. 1998) (holding that a "non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit").

The common theme here is that not until after the forfeiture action was filed did Van Bommel try to reverse course. He alleged through verified claims and his affidavit that the money was really his all along and that he did not mean to give up his right to it.  But when the district court ordered an evidentiary hearing specifically for the purpose of evaluating Van Bommel's standing and clearing up any factual discrepancies, Van Bommel offered no evidence.  Not only did he not submit to a deposition beforehand but at the hearing, Van Bommel did not testify[13] and did not offer an additional affidavit to firm up his claim of ownership.  For instance, it strikes us that evidence about how he came to own the $8 million and why he was racing across the sea with it in the dark of night would have helped buttress his claim. There was none of this.

For the reasons detailed above, Van Bommel did not have the requisite ownership interest in the $8 million needed to

---

[13] As we said earlier, Van Bommel was deported before the hearing but the record indicates that his counsel did not seek any relief from the district court to stay the deportation and even opposed the government's efforts to keep Van Bommel here.

establish standing in a forfeiture action.  As we said, standing requires an injury that is caused by the wrongdoer and likely to be redressed by the relief sought.  See Antilles Cement Corp., 670 F.3d at 317; U.S. Currency, $81,000, 189 F.3d at 34.  With no ownership interest in the $8,400,190, there is no possible way that Van Bommel can be injured by the forfeiture of the money. Dismissal of Van Bommel's claim as to the approximately $8 million contained in the bales was appropriate.

### ii. The $10,000 Van Bommel Was Carrying

The $10,000 Van Bommel was carrying is a different story. Not only did Van Bommel assert in his verified claims and affidavit that he was the owner, but other evidence corroborated this. Specifically, Van Bommel was found with the $10,000 on his person (he did not toss this into the ocean) and, at the time of his capture, he told law enforcement that he was paid $10,000 as the first part of a $40,000 payment to transport the bales.  Consistent with his story, all three of his crew members were found with $10,000 on their persons.  The tale continued to jibe when Van Bommel later told law enforcement that he and his crew were hired by Tomas for a smuggling venture.  Given all of this evidence, we find that Van Bommel demonstrated the requisite ownership interest in the $10,000 to have standing to contest its forfeiture.  See One-Sixth Share, 326 F.3d at 41.  At this stage in the proceedings, Van Bommel need not prove the full merits of his claim, just that

he has a colorable interest in the proceedings such that he satisfies prudential standing requirements. See U.S. Currency, $81,000, 189 F.3d at 35. He has done that.

The fact that Van Bommel signed a notice of abandonment - this is the fact that the district court harped on with respect to the $10,000 - does not change things. In his affidavit, Van Bommel indicated that he "involuntarily and unintelligently" signed the notice after he was "threatened to be prosecuted for drug smuggling if [he] did not abandon the currency." He added that law enforcement did not advise him of his due process rights and that the notice of abandonment did not advise him "of the full panoply of rights counsel later explained to me," such as the right to present evidence and to have a jury determine whether forfeiture was warranted.

The dissent would have us disregard this affidavit on the grounds that it is hearsay. We are not convinced such an approach makes sense. First, the government did not raise any hearsay objection to the affidavit, nor is it making such an argument on appeal. Indeed it would be surprising if it was since the government, in support of its motion for summary judgment, relied heavily on its own affidavit - the affidavit completed by ICE agent Antonio Rivera, which detailed what happened the night the money was seized and Van Bommel's conversations with law enforcement. The district court also raised no hearsay concerns.

Second, in analysis section B, i of this decision, which the dissent agrees with and has signed on to, we utilize not only Van Bommel's affidavit to explain why he has not proffered enough evidence to establish standing to contest forfeiture of the bale money, but we also rely on the government's affidavit. Given our reliance on these affidavits to decide Van Bommel's standing to contest the forfeiture of the bale money - again, the dissent does not disagree with that analysis - it seems inconsistent to now say that Van Bommel's affidavit should not be considered on the issue of whether he waived his right to contest the $10,000 because it is hearsay.

Finally, and perhaps more fundamentally, we disagree that Van Bommel's affidavit should be treated as inadmissable hearsay. While the district court called the parties in for an evidentiary hearing, no evidence was in fact taken at the hearing. The judge stated: "Well, I think that takes care of what we intended today, which was basically I wanted to receive additional information on certain issues, more so concerning the issue of standing. But as it stands today it will have to be a determination made on the record." Van Bommel's affidavit was never offered into evidence; its admissibility was not at issue. Affidavits are of course typically relied on to support or defend against motions for summary judgment. See Fed. R. Civ. P. 56(c)(1)(A). While it is true that such affidavits "must be made on personal knowledge" and

"set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4), and it "is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted," Kenney, 700 F.3d at 609 (internal quotation marks omitted), such hearsay concerns are not present here.

Furthermore, the case that the dissent cites for the proposition that claimants cannot establish Article III standing through hearsay, United States v. All Funds in the Account of Prop. Futures, Inc., 820 F. Supp. 2d 1305 (S.D. Fla. 2011), is not on all fours with this case.  The affiant in that case, who was the attorney for the claimant company, attested to a company vote taking place even though he was not present at it.  Id. at 1331-32. The court disregarded the evidence as inadmissable hearsay because the facts attested to by the affiant were not within his personal knowledge; instead the facts were only known to him because the claimants told him about them.  Id. at 1332.  This is not the situation here.  Everything in Van Bommel's affidavit, including the facts relating to his signing the notices of abandonment, were within his personal knowledge.  We see no reason why we should not consider Van Bommel's affidavit.

Thus, on the issue of Van Bommel's knowing and voluntary waiver of his interest in the $10,000 we are left with his affidavit; an affidavit, which despite the dissent's characterization, is not conclusory or cursory.  Rather, Van Bommel

-24-

clearly explained the threats that the law enforcement agents allegedly made and what rights he was not advised of. And no evidence on record contradicts his claims. The notice of abandonment, signed and dated by Van Bommel and witnessed by two government agents, indicated that Van Bommel understood his "right to assert a claim in the seized property" and to seek its return and that with "full knowledge of those rights," he was giving them up. Indeed the notice of abandonment does not go into detail (though we are not saying it necessarily had to) about Van Bommel's specific rights. And, more importantly, there is nothing in the record to contradict Van Bommel's claim that law enforcement did not advise him of certain rights and bullied him into signing the notice by dangling the threat of drug smuggling prosecution over his head. The government offered no affidavit evidence on this point, and the law enforcement officers ready to testify at the evidentiary hearing never testified. Furthermore, though the burden is on Van Bommel to convince us of his standing, it is important to remember that this case comes to us on the government's motion for summary judgment. Thus, facts are viewed in a light most favorable to Van Bommel and all reasonable inferences go in his favor. See Rared Manchester NH, LLC, 693 F.3d at 52.

The dissent's focus, on what it perceives as Van Bommel's gamesmanship in avoiding having his deposition taken and not

appearing at the hearing, is misplaced.  We are reviewing the district court's grant of summary judgment, of course making our review de novo.  See Kenney, 700 F.3d at 608.  This review centers on the record evidence, not the parties' tactics or course of conduct.  The attention the dissent devotes to the latter two things strikes us as a tack more appropriately taken when we are operating under an abuse of discretion standard and giving the district court a wide berth to make discretionary calls about the parties' demeanor and behavior.  But that is not the state of affairs here.

Given all this, we conclude that Van Bommel presented enough evidence to demonstrate constitutional standing to contest the forfeiture of the $10,000 found on his person.  While the dissent disagrees with us on this point, we think the dissent's approach gets close to collapsing the issue of Van Bommel's standing with the merits of his forfeiture claim, something courts should not do.  See One-Sixth Share, 326 F.3d at 41 ("Courts should not, however, conflate the constitutional standing inquiry with the merits determination that comes later.")  On this narrow issue of standing, we find that Van Bommel established the necessary ownership interest and has alleged an injury at the hands of the government that can be remedied by forfeiture of the $10,000 not going forward.  See U.S. Currency, $81,000, 189 F.3d at 34-35.  To be clear, we are saying nothing more than Van Bommel has the right

to contest the forfeiture.  Whether he will ultimately prevail on his assertion that the property should not be forfeited is up to the district court to decide.

**CONCLUSION**

To sum things up, there is no merit to Van Bommel's contention that the district court lacked jurisdiction over a portion of the defendant currency.  As for Van Bommel's standing, he does not have constitutional standing to contest the forfeiture of the $8,400,190 found in the bales.  He does, however, have standing to contest the forfeiture of the $10,000 found on his person.  The district court's grant of summary judgment resulting in the dismissal of Van Bommel's claim for the $8,400,190 is affirmed.  The court's grant of summary judgment as to the $10,000 is reversed and Van Bommel's claim for the $10,000 is reinstated.[14] Each side shall bear its own costs.

**-Concurring and Dissenting Opinion Follows-**

---

[14] The dissent suggests that, even assuming the district court erred, reversal with reinstatement is not the proper disposition. Rather it would have us vacate the grant of summary judgment and give the parties a chance to have a full evidentiary hearing.  We disagree.  We are asked to decide this appeal on the record at hand.  Here the court scheduled an evidentiary hearing but ended up deciding the government's motion for summary judgment on the record.  The question we are faced with is whether, based on the evidence that was considered by the court, this grant of summary judgment was erroneous.  As we explained above, we think it was as to the $10,000.  Reversal is proper.

**HOWARD, <u>Circuit Judge</u>, concurring in part and dissenting in part**.  I concur in the majority's opinion, except for its conclusion that Van Bommel demonstrated constitutional standing to contest the forfeiture of the $10,000 found on his person.  Van Bommel did not prove by a preponderance of the evidence that he had a colorable interest in that money; he therefore lacks standing to contest its forfeiture.

As the majority explains, there is every reason to believe that Van Bommel was paid $10,000 to transport the bales of currency that he later threw into the sea.  Thus, at one point Van Bommel had a colorable claim of ownership of that $10,000.  But he signed a waiver that stated, in Spanish,

> I understand that I have a right to assert a claim in the seized property described above [i.e., the $10,000] and to seek return of the property.  With full knowledge of those rights, I hereby abandon any and all claims I may have to that property.  I waive my right to receive notice of future administrative or judicial proceedings involving the property. I also waive any further right to contest the administrative or judicial forfeiture of the property described above.

I think the majority would agree that if this waiver is valid, Van Bommel has no claim to the $10,000 and no standing to participate in this action.  Van Bommel argues, however, that his waiver is void because it was involuntary and unintelligent.  The majority believes that Van Bommel has produced sufficient evidence in support of this argument.  For the reasons below, I disagree.

-28-

## I. Background

Throughout this case, Van Bommel has worked tirelessly to prevent discovery of facts relating to his standing. I recount the relevant procedural history.

The government began this action by filing a complaint for forfeiture in rem on November 25, 2009. On December 22, 2009, Van Bommel pleaded guilty to conspiring to fail to heave to a helicopter, and on February 4, 2010, he was sentenced to time served. On February 26, 2010, Van Bommel's counsel advised the government that Van Bommel was scheduled for a final removal hearing before an Immigration Judge just four days later, on March 2. Van Bommel's counsel stated that the Immigration Judge had previously rejected a request for Van Bommel to remain in the United States pending the outcome of the forfeiture proceedings, so he "encourage[d] [the government] to complete any matters pertaining to any intended discovery, that would require Mr. Van Bommel's presence in this district, before he is removed from the United States." It appears that at the hearing, the Immigration Judge ordered that Van Bommel be removed on March 26. On March 4, the government responded to Van Bommel's counsel that it was trying to stay Van Bommel's removal so that he could be deposed, and it asked for dates on which Van Bommel's counsel would be available for the deposition. Van Bommel's counsel did not respond, and the government contacted him again on March 18 to arrange a deposition

on March 24. Van Bommel's counsel told the government that he would check his schedule to confirm the date. Instead of doing so, the next day he filed a claim in the forfeiture action for the seized bales of currency and the $10,000 found on his person. On the same day, he also filed a motion to dismiss the government's complaint and unilaterally canceled the deposition, considering it "unnecesary [sic] based on the arguments raised in our motion." The motion to dismiss featured Van Bommel's bare, unexplained claims of ownership of the $10,000 and the bales of currency, but it nowhere mentioned that Van Bommel's waiver of ownership was involuntary or unintelligent. When the government informed Van Bommel's counsel that it intended to conduct the deposition with or without Van Bommel, he filed an emergency motion for a protective order staying the deposition, which the court granted without a response from the government.

For reasons that are not clear from the record, Van Bommel's removal was postponed. He was still in the United States on April 13, when the government moved for summary judgment, asking the court to strike Van Bommel's claim for lack of standing. The government argued that Van Bommel had waived his ownership of the seized currency, and it attached to its motion Van Bommel's signed waivers of ownership of the bales of currency and the $10,000. As the government pointed out, a motion to strike a claim "must be decided before any motion by the claimant to dismiss the action."

-30-

Rule G(8)(c)(ii)(A), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules").

Van Bommel was removed from the United States a week later, on April 20.[15] On May 3, he filed an opposition to the government's motion for summary judgment. Attached to that motion was a declaration, dated April 29, which stated that his waiver of ownership was involuntary and unintelligent:

> During law enforcement interviews I involuntary [sic] and unintelligently signed a Notice of Abandonment of All Rights and Interest in Property. I signed the papers after I was threatened to be prosecuted for drug smuggling if I did not abandon the currency. The law enforcement agents never advised me of any of my Fifth Amendment rights and I was completely unfamiliar with U.S. law. The Notice of Abandonment did not advise me of the full panoply of rights counsel later explained to me, i.e., the standards of proof under [the Civil Asset Forfeiture Reform Act of 2000], right to cross-examine witnesses, present evidence, right to be assisted by Counsel, and the right to have a jury determine the forfeitability of the defendant currency, so as to establish that I made a knowing and intelligent waiver of these rights and my Due Process right to contest the forfeiture of the defendant currency. Once advised by Counsel of these rights, I asserted my ownership interest in the currency and categorically pursued my right to contest the forfeiture of my currency.

---

[15] The government later told the district court that it had requested a stay of deportation to depose Van Bommel, but the motion was denied because of Van Bommel's counsel's opposition. Van Bommel's counsel did not object to this characterization of the facts.

On July 28, the district court entered an order scheduling an evidentiary hearing "to evaluate disputed issues of fact regarding claimant's standing." Van Bommel's counsel did not notify the court that Van Bommel had left the United States and would be unavailable to testify, nor did he seek assistance from the court or the government with Van Bommel's application to enter the United States on parole for the purpose of testifying. See 8 C.F.R. § 212.5(b)(4) (describing authority to parole "[a]liens who will be witnesses in proceedings . . . conducted by judicial, administrative, or legislative bodies in the United States"). Instead, he sprang this information on the court at the evidentiary hearing, which took place on August 19.

At the hearing, the government was prepared to refute Van Bommel's declaration by calling two agents who had secured Van Bommel's signature on the waiver, but the court informed the government that they need not testify.[16] On March 15, 2011, the

_____

[16] The court stated, "Here I take it that the burden remains on the plaintiff to prove that he has the standing. And even assuming that he has it, if there is a waiver that basically supports the relinquishment allegation that the government is presenting or the fact that the property was abandoned. Assuming in the best scenario for the claimant here that he is questioning that, or he has come forward with sufficient evidence to raise doubts as to the voluntariness, I think as far as can I go is to kind of even tip the scale further for no justified reason on the record, and listen to the testimony of the agent as to how this waiver was procured and what were the circumstances under which it was offered just like in a suppression hearing. But still recognizing that if the government puts the witness on the stand it will be at the Court[']s request not because it has the burden of doing so, in order to prove standing or in order to prove the

-32-

court entered an order stating,

> Claimant provides no specific facts or details of the alleged coercion in his opposition to the motion for summary judgment, in claimant's opposing statement of uncontested fact[s], or in his verified declaration under penalty of perjury. In fact, aside from a single paragraph of allegations in his own sworn statement, claimant provides no evidence of law enforcement's coercion in obtaining his waiver of rights and signature on the Notice. Nor was claimant able to testify to provide further details in support of his claim. Thus, claimant has failed to establish that his signature on the Notice was both unintelligent and involuntary.

(citations omitted). Therefore, the court held that Van Bommel "has failed to establish standing or raise a material issue of fact as to his Article III standing" and dismissed his claims.

## II. Analysis

In a forfeiture proceeding, a claimant's burden to establish standing depends on the stage of the litigation. At the pleading stage, standing is not difficult to establish. See United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 638 (9th Cir. 2012); United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 41 (1st Cir. 2003) ("At the initial stage of intervention, the requirements for a claimant to demonstrate constitutional standing are very forgiving. In general, any colorable claim on the defendant property suffices."). But when he

_____

validity of the document they have in their possession right now."

-33-

court holds an evidentiary hearing, as the district court did here, the burden of proof rises:  a claimant "carr[ies] the burden of establishing standing by a preponderance of the evidence." Supplemental Rule G(8)(c)(ii)(B); Supplemental Rule G(8)(c)(ii) advisory committee's note.  Thus, Van Bommel "must prove by a preponderance of the evidence that he has a facially colorable interest in the res."  United States v. $148,840.00 in U.S. Currency, 521 F.3d 1268, 1273 (10th Cir. 2008).

To establish standing at an evidentiary hearing, a party must present admissible evidence supporting its claims.  United States v. $543,190.00 in U.S. Currency, 535 F. Supp. 2d 1238, 1247 (M.D. Ala. 2008); Stefan D. Cassella, Asset Forfeiture Law in the United States 381 (2d ed. 2013); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (holding that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").  The Federal Rules of Evidence determine whether evidence is admissible in a civil forfeiture action.  See Fed. R. Evid. 101(a), 1101; United States v. $92,203.00 in U.S. Currency, 537 F.3d 504, 509-10 (5th Cir. 2008).  Therefore, Van Bommel had the burden to produce admissible evidence that his waiver was unintelligent or involuntary.

Van Bommel's declaration--the linchpin of his claim to

standing--is inadmissible hearsay, not admissible evidence. Hearsay, of course, is a statement made outside of a trial or hearing, which a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801. Van Bommel's declaration is textbook hearsay: it was not made at a trial or hearing, and it was offered to prove that Van Bommel was coerced into signing the waiver. Generally, hearsay is inadmissible.[17] Id. 802. While there are several exceptions to the rule against hearsay, see generally id. 803, 804, 807, none applies here. As a result, Van Bommel produced no admissible evidence whatsoever that his waiver was unintelligent or involuntary.[18] See United States v. All Funds in the Account of Prop. Futures, Inc., 820 F. Supp. 2d 1305, 1331-32 (S.D. Fla. 2011) (holding that claimants could not

---

[17] We have held that a court may receive hearsay at an evidentiary hearing on a motion for a preliminary injunction. Asseo v. Pan Am. Grain Co., 805 F.2d 23, 25-26 (1st Cir. 1986). In that case, however, we stressed "the need for expedition" that characterizes an injunctive proceeding, and that the hearsay at issue previously had been subject to cross-examination. Id. at 26. Neither circumstance exists here. Even if it were appropriate both to extend Asseo to an evidentiary hearing regarding standing in a forfeiture action, and to take the further step of requiring the affidavit's admission, Van Bommel's declaration would be entitled to little or no weight, given its lack of factual detail and Van Bommel's efforts to prevent cross-examination. Cf. Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) ("The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.").

[18] Van Bommel could have avoided this result by attending his deposition. If he was unable to return to the United States for the evidentiary hearing, he then could have offered his deposition testimony into evidence under Federal Rule of Evidence 804(b)(1).

establish Article III standing through hearsay). This alone requires us to affirm the district court's decision.[19]

Even assuming that Van Bommel's declaration could have been considered at the evidentiary hearing, it was not enough to prove, by a preponderance of the evidence, that he had a colorable interest in the $10,000. "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity--or lack thereof." United States v. 1998 BMW "I" Convertible, 235 F.3d 397, 400 (8th Cir. 2000) (citing Goldberg v. Kelly, 397 U.S. 254, 269 (1970)). As the district court noted, Van

---

[19] The district court had no need to address the admissibility of the declaration, since Van Bommel's counsel never tried to move it into evidence. In any event, the transcript of the evidentiary hearing suggests that the court did not consider the declaration to be competent evidence: "The question would be, what is the evidence that you have of the threats? What is the evidence that you have that the waiver was not voluntarily signed?" Even if this was not the basis of the court's decision, we may affirm on any ground supported by the record. In re Miles, 436 F.3d 291, 293-94 (1st Cir. 2006).

The majority views it as inconsistent to set aside Van Bommel's declaration when deciding his standing to claim the $10,000, while relying on the government's affidavit when deciding his standing to claim the bales of currency. There is no inconsistency. As to the bales of currency, Van Bommel either failed to counter the government's allegations, or disputed them with allegations that were too vague or incredible to create a genuine dispute of material fact. Therefore, summary judgment was appropriate, without any need for more evidence. As to the $10,000, there was a genuine dispute about the circumstances of Van Bommel's waiver. To prove his standing by a preponderance of the evidence, Van Bommel was obligated to produce something more than his bare-bones declaration.

Bommel offered a single paragraph with "no specific facts or details of the alleged coercion."  In determining whether Van Bommel had established his standing by a preponderance of the evidence, the court gave this lone paragraph the short shrift it deserved.  See $133,420.00 in U.S. Currency, 672 F.3d at 638 ("As we have explained, a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." (internal quotation marks omitted)).  Courts routinely demand more facts and evidence from claimants than Van Bommel was willing to provide.  See Stefan D. Cassella, Asset Forfeiture Law in the United States 381-82 (2d ed. 2013) (collecting cases).  Van Bommel's declaration falls far short of proving his standing by a preponderance of the evidence.

Finally, even if the district court had erred (which it did not), I believe that the majority has chosen the wrong disposition by reversing the grant of summary judgment, rather than vacating it.  The government came to the evidentiary hearing with two witnesses prepared to testify about the circumstances under which Van Bommel signed his waiver.  Given Van Bommel's failure to offer any evidence at the hearing, the court told the government that the witnesses' testimony would be unnecessary.  By reversing the grant of summary judgment and reinstating Van Bommel's claim, the majority punishes the government for complying with the district court's guidance.  The more prudent course would be to

-37-

vacate the grant of summary judgment and give the parties another opportunity to present their evidence on standing.

### III. Conclusion

By letting this case proceed to the merits, the majority rewards Van Bommel's gamesmanship.[20] Van Bommel's counsel unilaterally canceled Van Bommel's deposition, fought to have him removed from the United States, failed to make a serious effort to secure his attendance at the evidentiary hearing, and kept from the court that he had been removed months before that hearing. It is difficult to imagine a party trying harder <u>not</u> to meet its burden of proof. Nevertheless, the district court must now expend judicial resources on an abandoned claim to $10,000. On this point, I respectfully dissent.

---

[20] The majority states that I have focused too much on Van Bommel's conduct and not enough on the record before the district court. This is a false distinction: Van Bommel's efforts at avoiding the development of evidence were well documented in the record. In any event, I focus on this conduct not because I believe that Van Bommel should be punished for it, but because it demonstrates that Van Bommel failed to develop any evidence, despite his burden to prove his standing by a preponderance of the evidence.